LOTTINGER, Judge.
This is a suit for personal injuries and property damages resulting from a non-collision automobile accident. The petitioners are Seaborn R. Wicker, individually and as the representative of his minor son, Brent Wicker, and his wife, Mrs. Jean Wicker. The defendants are Fred Trosclair, Inc., his insurer, Fidelity General Insurance Company, Frank J. St. Pierre and his employer, E. L. Holmes, doing business as Riverside Parish Oil Company, and the American Mutual Insurance Company, the uninsured motorist insurance carrier of Seaborn R. Wicker. Defendants, E. L. Holmes, doing business as Riverside Parish Oil Company and his employee, Frank J. St. Pierre, filed a third party petition against Seaborn R. Wicker and the American Mutual Insurance Company in an amount equal to one-half of any judgment which might be rendered in favor of Jean Wicker and Mr. Wicker, as representative of his minor child. Mrs. Wicker, and Mr. Wicker on behalf of his minor son, Brent, subsequently amended their petition to name Mr. Wicker’s liability insurer, American Mutual Insurance Company as a defendant.
After trial by jury, the Lower Court rendered judgment in favor of Mrs. Jean Wicker and against the defendants, E. L. Holmes, d/b/a Riverside Parish Oil Company, Frank J. St. Pierre, Fidelity General Insurance Company, Fred Trosclair, and the American Mutual Insurance Company in solido in the sum of $12,000.00 and in favor of Seaborn R. Wicker, for and on behalf of his minor child, Brent, and against the same defendants in the sum of $10,000.00. There was further judgment in favor of E. L. Holmes, Riverside Parish Oil Company, Frank J. St. Pierre, Fidelity General Insurance Company and Fred Trosclair, dismissing the claim, of Seaborn R. Wicker against them, and in favor of American Mutual Liability Insurance Company against all petitioners insofar as the claim under the uninsured motorist protection policy was concerned. Appeals have been taken by, all defendants. No appeal has been taken by any of the plaintiffs, nor have they answered the appeals.
The facts are that during the early afternoon of November 2, 1965, sometime between 1:00 and 2:00 p.m., Seaborn Wicker was operating his 1965 model Cadillac automobile in a southerly direction on Airline Highway en route from his home in Baton Rouge to an airport in New Orleans. His wife, Mrs. Jean Wicker and his four year old son, Brent, were’passengers in the front seat of this vehicle. It was the intention of Mr. Wicker to take an airplane from New Orleans for a business trip, and the testimony indicates that he was fearful that he would miss his plane.
During the course of this journey it was conceded that Mr. Wicker was traveling at a speed of generally seventy-five to eighty-five miles per hour along the Airline Highway prior to the accident. The *422 weather was clear and there was light traffic. Airline Highway is a heavily traveled four lane highway with two lanes for southerly traffic towards New Orleans and two lanes for northerly traffic towards Baton Rouge.
As the Wickers reached a site identified as the “Hooper’s Sign”, Mr. Wicker testified that he let up from his speed of about eighty to eighty-five miles per hour and started to slow down to about seventy miles per hour. Shortly thereafter, as they reached another site identified as the “Boyce-Harvey Sign”, his wife made the comment that they had plenty of time to make the plane and that there was no need to rush, whereupon he eased off the accelerator and let his car reduce its speed to approximately sixty miles per hour. At about this time Mr. Wicker testified that he was in an intersection approximately where the accident occurred. This intersection is controlled by a blinking caution light for traffic on the Airline Highway and a blinking red light for traffic on U. S. 51 entering the Airline Highway.
Mr. Wicker alleges that as he approached the yellow caution light he was in the left southbound traffic lane, and while still some distance north of the accident scene, he noticed a “dirty red or orange dump truck” enter the right-hand southbound lane of Airline Highway from U. S. 51 to the west. This dump truck then allegedly remained in the right-hand southbound lane at a very slow speed, some ten to twenty miles per hour and Mr. Wicker remained in his left-hand southbound lane, approaching the truck from the rear with the intention of passing. He testified that as he was just to the rear of the dump truck, the dump truck suddenly and without signaling swerved from the right-hand lane into the left-hand lane in front of him, thus blocking his lane of travel and requiring him to slam on his brakes, swerve into the right-hand lane, then across the right-hand lane and off the shoulder of the highway. As he started this maneuver, he noticed a stopped or slowly moving vehicle immediately ahead of the dump truck, also in the right-hand lane of traffic, and this denied his passing into the right-hand lane to the rear of the truck.
The record discloses that at that point on the Airline Highway approximately five hundred feet toward New Orleans from the road leading to the town of Reserve (U. S. Highway 51), a white Mustang automobile belonging to John King was stopped on the shoulder of the road because of a flat tiré. A pick-up truck belonging to E. L. Holmes, d/b/a Riverside Parish Oil Company, and driven by Frank St. Pierre which had also been proceeding towards New Orleans, had stopped in the right lane of the Airline Highway approximately opposite the stalled vehicle on the shoulder. The purpose of the stop by the pick-up truck was to render assistance to Mr. King, the stalled motorist. The pick-up truck stopped in this position only for some five to ten seconds. It was when the pick-up truck was either in this stopped position or was just pulling off from the stopped position that the oncoming dump truck swerved from the right to the left-hand lane of traffic to pass the pick-up truck, thus causing the emergency to the Wickers. The Wicker vehicle ran into a ditch on the right side of the road, causing his vehicle to turn over, resulting in the injuries to himself, his wife, and child. Neither the Mustang, the pick-up truck nor the dump truck were struck nor damaged by the Wicker automobile.
This case was tried in the Lower Court before a jury, which held Mr. Wicker, the driver of the pick-up truck, and the driver of the dump truck all guilty of negligence proximately causing the accident. The jury held furthermore that the dump truck, which did not stop at the scene of the accident, was owned by Fred Trosclair, Inc. Damages were assessed against Mr. Wicker, Fred Trosclair, Inc., the owner of the dump truck, and Frank J. St. Pierre and his employer, E. L. Holmes, d/b/a Riverside Parish Oil Company, the driver and *423 owner of the pick-up truck, and their respective liability insurers. Neither of the three petitioners have appealed, nor have they answered the appeals of the defendants, therefore, we are not now concerned with the negligence, vel non, of Mr. Wicker, nor with the question of any increase in quantum allowed by the jury to his wife and minor son. The negligence of Mr. Wicker has been admitted.
We believe that the record clearly discloses that the driver of the pick-up truck and the driver of the dump truck were both guilty of negligence which proximately caused the accident. The driver of the pick-up truck admits that he stopped in the right-hand lane of traffic going south for a period of some five to ten seconds to render assistance to the driver of the stalled Mustang automobile. It was either while he was so stopped, or just as he commenced to drive off from his stopped position that the accident occurred. The driver admits that there was ample room for him to pull off onto the shoulder of the highway either to the front or to the rear of the stalled vehicle.
Title 32, Section 141 of the Louisiana Revised Statutes provides, in part, as follows :
“Upon any highway outside of a business or residence district, no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or main traveled part of the highway when it is practicable to stop, park or so leave such vehicle off such part of said highway * * * ” (Emphasis ours.)
We feel, as did the jury, that the negligent action of the driver of the pick-up truck in stopping on the main traveled portion of the highway set off the chain of events which caused the accident. While the pick-up truck was so stopped, the driver thereof apparently did not look behind him and did not see the approach of the dump truck which apparently pulled out of the road leading to the town of Reserve after St. Pierre last looked behind him. The dump truck proceeded a few hundred feet down the road and turned, without looking, into the left lane at a relatively slow rate of speed in order to pass the pick-up truck. Wicker, approaching from behind the dump truck, was then faced with the dump truck in the left lane, the pick-up truck in the right lane, and the Mustang on the shoulder of the road. It is precisely to avoid this kind of situation that the statute against parking or stopping in the road was enacted. The act of stopping on the traveled portion of a highway is even more dangerous on a high speed highway such as the Airline Highway where the speed limit is seventy miles per hour. There is r.o evidence in the record that Mr. St. Pierre, the driver of the pick-up truck, made any effort to warn any oncoming vehicles of the fact that he was stopped on the road. Had St. Pierre not stopped in the road, there would have been no occasion for the dump truck to change lanes, and there would have been no obstruction for the high speed traffic including Mr. Wicker to have any difficulty.
Nor do we believe that there is any question but that the driver of the dump truck was also guilty of negligence proximately causing the accident. The record discloses that he was proceeding in the right-hand lane of traffic at a speed of some twenty-five miles per hour when he suddenly and without warning swerved into the left-hand lane of traffic to pass to the left of the stopped pick-up truck. Title 32, Section 79 of the Louisiana Revised Statutes contains the following language:
“Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules, in addition to all others consistent herewith, shall apply:
(1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained *424 that such movement can be made with safety.”
Had the driver of this dump truck been paying the necessary attention to traffic on the roadway, he would have noticed the high speed approach of the Wicker vehicle from his rear, and, from his speed of approximately twenty-five miles per hour,N could have come to a stop to allow the Wicker vehicle to pass him to his left. Although there is some question in the record as to whether the Wicker vehicle was in the right or left-hand lane of southbound traffic at the time the dump truck swerved suddenly to its left, we do not believe that this makes any difference regarding the negligence of the driver of the dump truck.
The jury apparently believed the testimony of Mr. and Mrs. Wicker to the effect that they had been proceeding in the left-hand lane of traffic when the dump truck suddenly and without warning swerved from the right to the left-hand lane of traffic immediately in front of them. This testimony is substantiated by that of Mr. King, the driver of the stalled Mustang, who testified that after the pickup truck came to a stop in the right lane, he spoke to the driver and asked him to send someone to render him assistance to fix .a flat tire. He stated that he then stepped back from the pick-up truck so that the pick-up truck could pull away and as he turned to walk back to his car, and with no distinction in time, he saw a dump truck in the left-hand lane of the highway headed south and immediately behind the dump truck there was the Cadillac which was cutting from behind the dump truck from the left lane into the right lane. Noticing the impending crash, Mr. King ran in the opposite direction.
The next question to be determined relates to the ownership of the dump truck involved in the accident which was held by the jury to have been that of Fred Tros-clair. The dump truck did not stop at the scene of the accident, and it could have been that the driver thereof did not know that an accident had occurred to the rear of the truck he was driving.
The testimony discloses that after Mr. Wicker got out of the hospital following the accident, he went, in the company of an investigator employed by his attorney, down to the general area of the accident. They searched the area for a day or so and secured the names of various people who owned dump trucks in the area. As they searched around Reserve looking for trucks similar to the one involved in the accident, they came upon a dump truck from the rear. Both Mr. Wicker and his investigator testified to the effect that immediately upon seeing the truck, Mr. Wicker said “that’s the truck”. They followed the truck into Mr. Trosclair’s place of business.
After Mrs. Wicker was discharged from the hospital, Mr. Wicker brought her to Mr. Trosclair’s yard and had her look at the truck and although she was not as definite as was her husband, she also felt that there was a very good chance that this was the truck which was involved in the accident.
Mr. Trosclair, on the other hand, maintained that,the truck which was identified by Mr. Wicker had been laid up at the time of the accident. He was corroborated in this testimony by his son, Adam Tros-clair and another employee, Mr. Peter Vicknair. A substantial question of credibility was raised as to the testimony of these three witnesses because of inconsistent statements made in the depositions, as well as inconsistent statements in a recorded telephone conversation which Mr. Tros-clair had with the investigator employed by Mr. Wicker. On deposition, the three did not agree as to the time of the repairs, as to the exact nature of the repairs, as to how the repairs were made, nor where the truck had been and where they had been on the day of the accident.
There was ample evidence for the jury to have determined that Mr. *425 Wicker was correct in his identification of the Trosclair truck as being the one at the scene of the accident. The jury saw the parties, they heard the testimony of the witnesses, and they were fully cognizant of the discrepancies in testimony. Our jurisprudence is well established to the effect that the jury’s findings of fact, particularly those involving credibility of witnesses, will not be disturbed on appeal unless clearly erroneous. Richoux v. Grain Dealers Mutual Insurance Co., 175 So.2d 883; Martin v. LeBlanc, La.App., 157 So.2d 283; McConathy v. United Services Automobile Assn., La.App., 188 So.2d 470; Richard v. National Union Fire Insurance Co., La.App., 189 So.2d 460; and Bridges v. Wm. T. Burton Industries, Inc., La.App., 193 So.2d 886.
Following the accident, Mrs. Wicker was examined by her treating physician, Dr. L. P. Laville, Jr., in the emergency room of the Baton Rouge General Hospital. He found that she had a severe contusion of her left shoulder, that she complained of pain in her lower back and that she had several less severe contusions. X-rays revealed a compression fracture of the second lumbar vertebra. When this fracture occurred, the adjacent ligaments and the adjacent muscle structures were also severely bruised and contused by an injury of the caliber to produce her bone compression. Dr. Laville testified that this type of injury is a very painful one because there is so much associated muscular spasm and irritation. The contusion of the left shoulder was approximately ten to twelve inches in circumference. Because of the compression fracture, Mrs. Wicker would be more likely to develop traumatic arthritis or osteoarthritis at the injury site.
She remained hospitalized for approximately four days during which time she was fitted with a hyper-extension brace. She wore this brace for approximately six weeks. During the first three months following the accident, Mrs. Wicker was totally disabled. Dr. Laville estimated that it would be two or three years’ time before she would be over 90 percent of the pain associated with her injuries. He estimated that the other 10 percent of her pain would probably remain for life. He stated that a compression fracture is a permanent condition, and that it would be at least three years before Mrs. Wicker would be essentially free of the symptoms.
Mrs. Wicker testified that for the first three months following the accident she was hardly able to do anything, or do any heavy work. As she gradually improved, she still had difficulty described as having a catch or twinge in her back as she does heavy work or suddenly bends over and picks up something without thinking and stands up real straight. When this occurs she has soreness in her back for several days. She still sleeps on a heating pad at times and the pain is described as a nagging kind that makes her nervous and irritable. The Lower Court awarded Mrs. Wicker $12,000.00 for these injuries.
The injuries to young Brent Wicker were a severe laceration of the nose and his upper lip which had developed a flap on the side of his nose which was turned up toward his forehead. He was bleeding severely from the wound when he arrived at the hospital. As he had recently eaten lunch, Dr. Laville did not feel it safe to anesthetize the child, so he sedated him and did his best to gain rapport with the child, repair the laceration and stop the bleeding. Seventy stitches were required to close the wound. This was done while he was wide awake. The initial misalignment was so bad that he was able to flop one-half of his nose up over the other eye. The doctor began suturing the lip in order to get the proper alignment and worked up to the angle of the nose as it broke off from the cheek and worked right up the nose to the top of the scar near the eyebrow. The sutures were removed on the sixth day. Antibiotic therapy continued for eleven days. On the eleventh day, a blood clot was removed from the inside of the young man’s nose with a pair of forceps. It was not until approximately one *426 month after the accident that young Brent was able to breathe through the involved side of the nose without difficulty. Plastic surgery was performed, and although a good result was obtained, this young boy is still sensitive in the injured area.
Dr. Richard W. Huges, an expert in the field of plastic surgery, testified that Brent needs a surgical procedure known as “Z-Plasty” which is a lengthening of the scar to prevent the webbing, and notching. This is necessary to get maximum improvement, but should not be done until the future. For these injuries, the Lower Court awarded young Brent damages in the sum of $10,000.00.
Section 3 of Art. 1934 of the Louisiana Civil Code provides, in part, as follows:
“In the assessment of damages under this rule, as well as in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury * ^ * ”,
In Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149, the Supreme Court in quoting said rule said:
“The primary question before the appellate court, then, is whether the judge or the jury in fixing the amount of the award has abused this great discretion vested in them by law. If for the purpose of uniformity the amount of the award is to be determined and fixed within certain limits — a maximum and a minimum based on prior adjudicated cases — , the discretion vested by the Code in the judge or the jury may be destroyed or at least stringently curtailed. In view of our codal provision, the appellate courts should consider the amount of awards in other cases only so far as they are relevant to the question of whether the judge or the jury has abused its discretion in fixing the award in the case under consideration.”
Subsequently, in Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127, the Supreme Court said:
“We recognize that in cases of this type the Constitution makes it the duty of appellate courts to review both the law and the facts, but in their examination of the fact these courts must give effect to the basic law set out in Article 1934(3) of our Civil Code that in the assessment of damages in cases of offenses and quasi offenses 'much discretion must be left to the judge or jury’. This law is plain and means what it says, and it is the duty of all appellate courts to follow it. Under this rule the amount of damages assessed by the judge or jury should not be disturbed unless the appellate court’s examination of the facts reveals a clear abuse of the discretion vested in the lower court.”
The record discloses that both Mrs. Wicker and her son, Brent, received not only painful but rather serious injuries as a result of this accident. Mrs. Wicker will suffer some disability for the remainder of her life, young Brent will suffer scars probably for the remainder of his life. In its wise discretion, the jury awarded Mrs. Wicker the sum of $12,000.-00 for her physical injuries, and young Brent, $10,000.00 for his injuries. We find no error in such awards.
For the reasons hereinabove assigned, the judgment of the Lower Court will be affirmed, all costs of this appeal to be paid by defendants-appellants.
Judgment affirmed.