175 So.2d 883 (1965)
Andrew RICHOUX and Charles Gallagher, Plaintiffs and Appellees,
v.
GRAIN DEALERS MUTUAL INSURANCE COMPANY, Defendant and Appellant.
No. 1418.
Court of Appeal of Louisiana, Third Circuit.
June 2, 1965.
Rehearing Denied June 24, 1965.
*884 Mouton, Champagne & Colomb, by George Champagne, Jr., Lafayette, for defendant-appellant.
Domengeaux & Wright, by Bob F. Wright, Lafayette, for plaintiffs-appellees.
Before FRUGE, CULPEPPER and HOOD, JJ.
HOOD, Judge.
This is a tort action instituted by Andrew Richoux and Charles Gallagher arising out of a collision between a pick-up truck owned by Richoux and an automobile owned by Raymond C. Jackson. Plaintiffs were riding in the pick-up truck at the time of the accident, and they allege that each sustained personal injuries and other losses as a result of the collision. The suit was instituted against Grain Dealers Mutual Insurance Company, the public liability insurer of the driver of the Jackson automobile.
After trial on the merits, judgment was rendered by the trial court in favor of plaintiffs, awarding damages to Richoux in the sum of $5,622.23 and to Gallagher in the sum of $20,738.25, and defendant has appealed. No answer has been filed to the appeal. Defendant admits liability, and the only question presented here relates to quantum.
The accident occurred on August 17, 1962, at an intersection in the City of Lafayette, Louisiana. The pick-up truck in which both of the plaintiffs were riding was struck broadside by the Jackson automobile, and the blow caused the pick-up truck to overturn and to come to rest in an upside down position.

Claim of Andrew Richoux
Richoux testified that shortly after the accident occurred he experienced pain in his chest and in the low back area. He was examined immediately by Dr. Richard G. Saloom, a general practitioner, and he was treated by Dr. Saloom from that date until October 15, 1962, when the doctor discharged him. On December 27, 1962, or more than two months after being discharged by the first treating physician, Richoux consulted Dr. Walter B. Comeaux, Jr., a specialist in thoracic surgery, and was treated by Dr. Comeaux until March 4, 1963. He also was examined by Dr. Fred C. Webre, an orthopedic surgeon, on February 20 and on June 10, 1963. Richoux states that the pain in his chest completely disappeared while he was being treated by Dr. Comeaux, but that his back still pains him at times "in the bottom part of my back and the middle of my back."
*885 Richoux is an electrical contractor, with four regular employees. His duties are partly of a supervisory nature, but he also performs some of the labor required of electricians. He testified that for a period of about eight months after the accident, and because of the injuries which he received, he was not able to perform some of the manual labor required of electricians, although he has been able to perform all of his regular supervisory duties without interruption.
Dr. Saloom testified that in his opinion Richoux sustained a contusion of the lower chest area and a strain of the back. He found no fractures or internal injuries, and he did not anticipate any permanent disability. Although plaintiff still manifested some tenderness and weakness in the area of the back when he was discharged by Dr. Saloom, the doctor felt that "he wasn't feeling any great discomfort," and that "in a matter of time he should become symptom-free."
Dr. Comeaux, the other treating physician, concluded that Richoux sustained a twisting injury of the thoracic and lumbar spines and a contusion of the upper anterior rectus muscle on the right. He also found that plaintiff had an arthritic spurring in the area of the thoracic vertebrae and a congenital malformation of the lower lumbar spine, both of which conditions pre-existed the accident. He testified that in his opinion the accident aggravated Richoux's previously existing arthritic condition, that Richoux may experience pain intermittently from time to time, and that the prognosis is speculative as to whether or not he will be completely relieved of pain. He noted, however, that Richoux had recovered from the chest and lower back injuries by the time he last treated him, and that his only complaints at that time related to the area of the thoracic vertebra, where the pre-existing arthritic changes had been found.
Dr. Webre found minimal hypertrophic spurring of the anterior margins of D-8 and D-9, and a spina bifida occulta at S-1. However, he noted no muscle spasm, no sensory changes, no weakness or atrophy and no neurological changes. He concluded that Richoux had sustained a moderately severe strain of the mid-back area, but that his condition was not disabling, that he could continue his normal occupation with minimal difficulty, and that there would be complete recovery within a period of six months.
Richoux, in response to the suggestion of his own attorney, also was examined by Dr. Charles B. Wilson, an orthopedic surgeon, shortly after the accident occurred. Dr. Wilson was not called as a witness, and the record contains no explanation by plaintiff as to why he was not called. Under those circumstances, a presumption arises that Dr. Wilson's testimony would not be favorable to plaintiff's case. Shamie v. Bowsky, et al., La.App. 4 Cir., 152 So.2d 843; White v. Insurance Company of North America, et al., La. App. 4 Cir., 150 So.2d 908 (cert, refused); Barbara v. Lumbermen's Mutual Casualty Company, et al., La.App. 4 Cir., 137 So.2d 466, and cases therein cited.
The trial judge concluded that Richoux had suffered "much pain" as a result of the accident, and that he was continuing to suffer from his back, although "there is no concrete evidence to show that he will be permanently disabled." He thereupon awarded Richoux the sum of $2,500.00 for the injuries which he had sustained and for the pain and suffering occasioned by those injuries.
We agree that the evidence fails to show that Richoux will be permanently disabled. It does show, however, that he was still suffering pain at the time of the trial, which occurred about sixteen months after the injury was sustained, and that he may continue to suffer some intermittent pain as a result of this injury for an indefinite but relatively short period of time thereafter. Under the facts presented *886 here, we think the award of $2,500.00 made to Richoux to compensate him for the general damages he sustained is fair and is not excessive.
In addition to the general damages awarded to this plaintiff, the trial judge also awarded him the following special damages:

 Medical expenses.......... $ 437.54
 Truck rental ............. 303.44
 Paid to other electrical
 contractors ............ 405.00
 Loss of supplies.......... 605.25
 Damage to truck .......... 1,371.00

The evidence supports the award of $437.54 for medical expenses.
As a result of the accident, Richoux's truck was damaged to the extent that it was a total loss. Plaintiff clearly was aware of that fact, because he received an estimate as to its salvage value within six days after the accident occurred, and thereafter he purchased a new panel truck to replace the pick-up truck which was involved in the collision. The trial court nevertheless awarded Richoux the sum of $303.00, being the amount which he allegedly paid for leasing another truck between the time of the accident and the time he purchased a new truck.
The general rule is that damages for the loss of use of a vehicle are not recoverable when the vehicle is totally destroyed, or so nearly destroyed as to not be susceptible of repair. There is an exception to this general rule, however, when the owner does not know whether the vehicle is a total loss, and in that case an award may be made for loss of use during a reasonable period of time within which it takes the owner to ascertain that the vehicle is a total loss. Drewes v. Miller, et al., La.App., Orl., 25 So.2d 820; Vest v. State, La.App. 1 Cir., 90 So.2d 896; Morgan v. Hartford Accident & Indemnity Company, et al., La.App. 1 Cir., 100 So.2d 279; and LeBlanc v. Southern Farm Bureau Casualty Insurance Co., et al., La.App. 1 Cir., 104 So.2d 279. The same rule is applicable to a claim for the expenses incurred by the owner in renting a vehicle to replace for a period of time the one which has been totally destroyed.
Since Richoux's truck was damaged beyond repair as a result of the accident, and since Richoux was aware of that fact immediately after the accident occurred, we conclude that the trial judge erred in permitting him to recover the amount which he paid as rental for another truck following the accident.
Richoux testified that shortly after August 17, 1962, it was necessary for him to engage the services of another electrical contractor to complete some jobs which he had started prior to the accident. This was necessary, he states, because the injuries which he received prevented him from performing some of the manual labor which would be required, and because of the fact that one of his employees, Gallagher, also was disabled for a period of time as a result of this accident. He testified that he paid $405.00 to this contractor for that work. His testimony to this effect is supported by the testimony of the contractor whom he engaged for that purpose. Defendant produced no evidence tending to show that this item of expense was not incurred by Richoux. And, we cannot say that the trial judge erred in allowing this plaintiff to recover the sum which he paid to another electrical contractor to do this work.
The trial judge awarded Richoux $605.25 as the replacement value of numerous electrical fittings, wires, tools, appliances and other supplies, all of which Richoux contends were in his truck at the time of the accident. The evidence shows that all of these items were recovered after the accident and are now in Richoux's possession. At Richoux's request, a representative of an electrical supply house inventoried and made a list of these items, with figures *887 showing the current replacement value of each. This list, which was received in evidence, indicates that the total replacement value of all such supplies amounts to the sum of $605.25. The trial judge awarded that amount to Richoux for that item of damages.
Richoux testified that two ladders which were included in the list were broken, that all of the wire in the truck was damaged beyond use by gasoline and oil, and that a water cooler, also on the list, was bent and damaged beyond repair. Richoux's testimony to this effect is uncontradicted, and accordingly we think he is entitled to recover for these items. The ladders have a value of $39.20, all of the wire shown to have been on the truck was valued at $230.82 and the water cooler had a replacement value of $11.50. The total value of these damaged items, therefore, amounts to the sum of $281.52, and we think plaintiff is entitled to receive that sum. In our opinion, however, the evidence fails to establish the loss of any of the other items included in this list. We conclude, therefore, that the award made by the trial court for the loss of tools, merchandise and supplies must be reduced to the figure hereinabove shown.
The evidence shows that at the time of the accident Richoux's truck had a "NADA Blue Book" value of $1,255.00, and that after the accident it had a salvage value of $305.00, indicating that the net loss sustained by Richoux for damages to the pick-up truck was $950.00. Richoux contends, however, that he is entitled to recover additional sums representing attachments or accessories which he had added to the truck prior to the accident. These included the amount which he had paid for the current year's truck license, the additional amount which he paid originally for the truck at least two years earlier in order to get a custom cab on it, the amounts paid for a rear bumper, heater, mirrors, overload springs, and turn signals. He also claims the sum of $114.00, being the amount which he allegedly paid for tires one month prior to the accident, and $100.00 as the value of toolboxes and racks which had been installed in the rear of the truck. The trial judge awarded Richoux the additional amounts claimed.
The evidence does not show whether the "NADA Blue Book" value of the truck included the tires, the custom cab, the rear bumper or the other accessories mentioned by Richoux, and we have no way of knowing what the value of the truck would have been had all of these items been removed from the truck. Also, the evidence does not establish that Richoux has sustained any loss relating to the toolboxes and racks which had been installed in the rear of the truck. He claims the amount which he originally paid to have these boxes and this rack constructed, but he states that the boxes were constructed several years ago, that he has transferred them from truck to truck as he purchased new ones, and that after this accident he purchased a different kind of truck and he thus has no further use for the boxes or the racks. Also, the photographs appearing in the evidence indicate that there was little, if any, damage to the boxes and rack as a result of the accident, and even if there was there is nothing to show what their depreciated value might have been at the time of the collision.
Considering all of the evidence, we conclude that the value of the truck prior to the accident was $1,255.00, that it had a salvage value of $305.00, and that Richoux's loss because of the damages to the truck amounted to the sum of $950.00. The award made by the trial court for this item, therefore, will be reduced to that amount.
For the reasons herein assigned, we have concluded that the award to Richoux should be reduced from $5,622.23 to the sum of $4,574.06.

*888 Claim of Charles Gallagher

Plaintiff Gallagher testifies that immediately after the accident his left arm "was hurting quite a bit, * * * right up in the point of the shoulder." He went to an infirmary where x-rays were taken and heat treatments were administered. He then returned to his home, but a few days later his doctor confined him to a hospital for twelve days for additional treatment. He returned to his employment about three weeks after the accident occurred, and he continued to work regularly at his employment for more than four months, until the latter part of January, 1963, although he continued to go to his doctor for heat therapy during that time. He states that while working at his employment after the accident, he was assigned mostly to supervisory duties equiring little or no manual labor. He was hospitalized again principally for further microtherm treatments from May 6 to May 10, 1963. He testified that since the accident his shoulder pains him "not too much, but enough," when he twists his left arm or attempts to lift it above head, and that at times he takes pills to relieve the pain. He says, "I can't do the heavy work I used to do," and that he is able to do "very little" as an electrician.
Gallagher is forty years of age. He has an eighth grade education and has been employed for a number of years as an electrician. He was employed by plaintiff Richoux, to do that type of work at the time the accident occurred. As an electrician it is necessary at times for him to install overhead lighting fixtures and to do other work which require him to raise his arms above his head.
The evidence shows that about five or six years before this accident occurred Gallagher sustained a fracture of the upper portion of his left arm and he was hospitalized for a period of about three months in connection with the treatment of that injury. The treatment administered at that time consisted of heat therapy to and the massaging of his left shoulder and left arm. Gallagher states, however, that in spite of that injury he thereafter had no difficulty in using his left arm or shoulder and that he experienced no pain in that part of his body shortly before the accident involved in this suit occurred.
It also appears that on February 8, 1963, or almost six months after the injury which forms the basis for this suit was sustained, Gallagher slipped and fell to the floor in his home, striking the left side of his face on a flower box as he fell. As a result of that fall, the left side of his jaw was fractured and it was necessary for him to be hospitalized for a period of four days and to have his jawbone wired together. He states that although the left side of his face struck the flower box, he fell on his right shoulder and that his left shoulder was not injured or involved in the fall at all.
Dr. Richard G. Saloom treated Gallagher for the injuries which form the basis of this suit from the date of the accident until May 24, 1963, the treatment consisting principally of physiotherapy, microtherm treatments and medication. He determined that there was no fracture and no dislocation, but he found tenderness in the area of the left shoulder, and during the course of his treatment, he noted "a sort of creeching noise" or a "grating sensation" in that shoulder joint. Dr. Saloom, however, has been unable to determine the cause of Gallagher's symptoms or complaints. He classified the pain which Gallagher experienced as "moderate," and he felt that Gallagher was disabled at the time he last examined him. He testified, however, that he was unable to express any opinion as to the extent or duration of that disability, and that in his opinion it would be necessary to determine what changes have occurred in the bone structure of Gallagher's shoulder before such a prognosis can be made.
Dr. Edward T. Haslam, an orthopedic surgeon, examined plaintiff on November 1, 1963, and on April 11, 1963. Plaintiff incorrectly *889 informed Dr. Haslam that he had had no previous injury to his shoulder, so when these examinations were made the doctor was not aware of the fact that plaintiff had sustained a serious fracture of the left arm or shoulder about five years before this accident occurred. Upon examining x-ray films which were made of plaintiff's shoulder shortly after the accident occurred, as well as an x-ray which was taken of plaintiff's chest on August 16, 1962, just one day before this accident occurred, Dr. Haslam noted extensive and unusual changes in the left shoulder, and since he had received a history of no prior injury to that shoulder, he concluded that plaintiff might be suffering from "Paget's Disease," or from some other rare disease of the bone, which disease existed before this accident occurred. Because of the serious nature of such a disease, he considered it imperative that plaintiff have immediate medical investigation of this possibility, including surgical exploration and biopsies if a diagnosis cannot be confirmed by other means. He testified that until that is done he could not determine whether this diseased condition of the bones in the shoulder, which pre-dated the accident, had been aggravated by trauma.
Dr. Haslam further testified that in the event it is determined that plaintiff does not have Paget's Disease or some other rare disease of the bone, then in his opinion plaintiff sustained only a contusion of the rotator cuff or a slight rotator cuff tear. He states that if it is a tear it may heal after a period of light work and special exercises, but that in some cases surgery is required to repair it. In this instance, however, he feels that if there was a tear it is so slight that he would not recommend surgery at this time. Dr. Haslam felt that at the times he examined plaintiff he was disabled from performing work which requires the use of heavy drills and tools above shoulder level, but, like Dr. Saloom, he is unable to express an opinion as to whether plaintiff has a disease of the bone, whether the accident aggravated that diseased process, whether the disability is of a permanent nature, or what period of time will be required for complete recovery. It is appropriate to note here that none of the other doctors who examined plaintiff, including the treating physician, found that he had Paget's Disease or any other disease of the bone. Two of the examining physicians specifically disagreed with Dr. Haslam in the latter's feeling that plaintiff might have such a disease. This difference in opinion may be accounted for by the fact that each of the other two examining physicians were aware of plaintiff's prior shoulder injury, while Dr. Haslam did not have that information. When informed of the fact that plaintiff had sustained a fracture of the left shoulder prior to this injury, Dr. Haslam stated:
"* * * Now a different light has been cast upon it by the history, which I have subsequently heard, that he has been informed that he did have a fracture in this region a couple of years ago, and it would seem to me that this whole question needs to befrom my standpoint, as being a certaintycould be that Mr. Gallagher didn't and doesn't have anything of a serious and threatening nature in this shoulder; would have to be re-evaluated in the light of the additional history available."
Dr. William L. Zink, a general surgeon, examined Gallagher on April 19 and on December 12, 1963. He determined that the plaintiff had some atrophy of his left arm, that he had a twenty per cent restriction of abduction of his left shoulder, and that the shoulder "cracked" on external rotation. He also determined that Gallagher had sustained a serious injury to his left shoulder prior to 1962. He concluded that this plaintiff had "aseptic necrosis or sclerosis of the head of the humerus," which condition he described as being the "death of the bone without infection," and he stated that in his opinion this condition existed before the accident occurred on August 17, 1962. He feels, however, that the accident which occurred on the last *890 mentioned date aggravated the previously existing condition of and injuries to his left shoulder and caused the shoulder to become symptomatic. He concedes that he does not know what is causing Gallagher's present symptoms of pain or the limitation of abduction of his shoulder. He feels, however, that because of that pain and limitation plaintiff is totally disabled from working as an electrician, and that he will continue to be disabled as long as he experiences this pain. Dr. Zink noted that there has been some improvement in the aseptic necrosis of plaintiff's shoulder since the accident, and he was unable to say whether there would or would not be a complete recovery from that condition. He also was unable to express an opinion as to the duration of the pain which Gallagher now experiences. He feels, however, that the limitation of abduction of the shoulder is permanent, because of Gallagher's age, but he does not express an opinion as to whether that limitation alone is disabling. His testimony, in part, is as follows:
"* * * I really think that in this particular case the aseptic necrosis, assuming that he could work and everything before, has probably very little or nothing to do with this particular case, and that his injury is mainly one of injury to the soft tissues, and bending his arm around or even a rotator cuff injury is producing symptoms."

* * * * * *
"A. Well, he will have pain, I don't know for how long, from this injury, because I don't really know how much the injury is figuring in this thing, but I feel like his limitation of motionas I described beforeI feel like that in a man of this age it is permanent."
Finally, Gallagher was examined by Dr. Fred C. Webre on October 1, 1962, and on May 27, 1963. As a result of these examinations Dr. Webre concluded that he had a twenty per cent disability of the shoulder because of weakness and some limitation of abduction of that shoulder. He felt, however, that this disability was "temporary and partial," and was attributable solely to the old fracture which was sustained five years before 1962. He stated that the August 17, 1962, accident probably caused a rotator cuff tear, which was superimposed on an old injury, but in his opinion it was a mild to moderate tear, it was not severe enough to cause failure in abduction, and with a course of physiotherapy this condition will alleviate itself within a period of three or four months. He concedes that Gallagher will never have a normal, good shoulder because of the injuries which were sustained prior to 1962, and that there is a possibility that he may be permanently disabled. He feels, however, that if Gallagher returns to his previous work he will become relatively asymptomatic and will be able to perform all of the duties of an electrician within three or four months. Dr. Webre's testimony was taken by deposition in June, 1963, so it appears that in his opinion Gallagher would recover completely by September or October, or within a period of about fourteen months after the accident occurred.
As we have already noted, both Dr. Zink and Dr. Webre disagree with Dr. Haslam in the latter's conclusion that plaintiff may have Paget's Disease or some other disease of the bones of the shoulder.
The payroll record kept by Gallagher's employer shows that he did not work for a period of three weeks immediately following the accident which occurred on August 17, 1962. He returned to work during the early part of September, 1962, however, and he worked continuously thereafter until the last week in January, 1963, when he missed one week of work. He returned to work during the first week in February, but he sustained the injury to his jaw the latter part of that week, and he has not returned to work for Richoux since the jaw injury was sustained, except that he worked for him for a period of about three weeks in April, 1963.
*891 The trial judge, in analyzing the evidence relating to Gallagher's injuries, said:
"Mr. Gallagher suffered a serious injury to his left shoulder causing disability to perform many of the customary duties of his trade as an electrician. He contends that he cannot lift his left arm to an overhead position without pain or discomfort. The Court witnessed a demonstration of this attempted maneuver and could discern a popping or grating noise coming from within the area of the shoulder.
"As usual, there is conflict in the medical testimony. There is evidence of an injury prior to the accident which defendant contends is the reason of the disability, but there is also testimony that the accident aggravated the prior condition. The Court believes that the medical evidence preponderates in favor of the contention that the accident of August 17, 1962 caused the present complaints and disability."
On the basis of those findings, the trial court awarded Gallagher the sum of $20,000.00, plus the additional sum of $738.25 for medical expenses.
Applicable here is the established rule that the trial judge's findings of fact, particularly those involving the credibility of witnesses testifying before him, are entitled to great weight on appeal, and his conclusions as to the facts will not be disturbed unless found to be clearly erroneous. Hudson v. Arceneaux, La.App. 3 Cir., 169 So.2d 731.
With that rule in mind, we agree with the trial judge that Gallagher suffered a serious injury to his left shoulder, and that he has been disabled since the date of the accident from performing many of the duties of an electrician, particularly those duties which require him to work overhead with his left arm. The evidence also shows, we think, that the symptoms which Gallagher experienced immediately after the accident of August 17, 1962, were caused or brought about by the aggravation on that date of an old injury to his shoulder, and we cannot say that the trial judge erred in holding that his present complaints are attributable to the 1962 accident. The evidence does not show, however, that the pain which Gallagher now suffers or the disability which he now has is of a permanent nature. And we note that the trial judge did not hold that there would be any permanent disability or permanent residual effect from the injury.
In summing up the medical testimony, it appears that Gallagher was treated for several months by a general physician and surgeon, and in addition thereto, he was examined by another general surgeon and by two orthopedic surgeons. The treating physician was unable to determine the cause of his complaints or to express an opinion as to the extent of duration of the disability. One of the orthopedic surgeons who examined him thought is was possible that he had a malignancy or serious disease of the bone, but we agree with plaintiff that the evidence does not show that there was any such diseased process. After eliminating the possibility of bone disease, we interpret the testimony of the two examining orthopedic surgeons to be to the effect that Gallagher sustained a contusion of the rotator cuff or a slight rotator cuff tear, which condition causes only temporary and partial disability, although it may require surgery to repair it. Dr. Zink, a general surgeon, is the only doctor who apparently feels that he has a permanent disability, and that consists of a partial restriction of abduction of the shoulder. He would not say that plaintiff would continue permanently to suffer pain in his shoulder, and we are unable to determine from his testimony whether the partial restriction of abduction alone, after the pain subsides, would disable Gallagher from performing any of the duties of an electrician. Our conclusion is that as a result of the accident which occurred on August 17, 1962, Gallagher sustained a contusion *892 of the rotator cuff or a rotator cuff tear of the left shoulder, that this injury aggravated a pre-existing shoulder injury which he had and made it symptomatic, that the injury is not of a permanent nature, but that plaintiff was disabled from performing a substantial part of the duties of an electrician from the date of the accident until the date of the trial, and that he has sustained some loss of earnings as a result of this disability.
The trial judge did not indicate what portion of the award was intended to compensate Gallagher for the general damages he sustained. In our opinion, we think an award of $6,000.00 for the injuries and disability which he sustained and for the pain and suffering occasioned by those injuries would be fair and adequate.
Gallagher also contends that he is entitled to an award for loss of income, past and future. We have concluded that he was still partially disabled at the time of the trial, which took place sixteen months after the date of the accident. The evidence does not establish, however, how long this disability will continue. He was employed and received his full salary during a period of more than four months after the injuries were sustained. He was earning $80.00 per week at the time of the accident. We think an award of $4,000.00, or approximately his total earnings for a twelve month period, would adequately compensate him for his past and future loss of earnings attributable to the injuries which he sustained on August 17, 1962.
The award of the additional sum of $738.25 to Gallagher for medical expenses is supported by the evidence.
For the reasons herein set out, we think the total award made to Gallagher by the trial court is excessive, and should be reduced to the sum of $10,738.25. Some of the cases which we have considered in determining whether the award made here is excessive are: George v. Shreveport Transit Co., La.App. 2 Cir., 136 So.2d 711; Gambino v. Duplessis, et al., La.App. 4 Cir., 138 So.2d 868; Caro v. Comeaux, La.App. 1 Cir., 142 So.2d 531; Schexnaydre v. Becnel, et al., La.App. 4 Cir., 142 So.2d 555; Breaux v. Flithers, et al., La.App. 4 Cir., 144 So.2d 574; Stanford v. Bateman, et al., La.App. 1 Cir., 149 So.2d 753; Boyle v. Travelers Insurance Co., La.App. 3 Cir., 157 So.2d 471; Reeves v. State, La.App. 2 Cir., 80 So.2d 206; and Dickson v. Peters, et al., La.App. 2 Cir., 87 So.2d 187.
Prior to the trial of the case, Gallagher received from the compensation insurer of his employer the aggregate sum of $2,404.34 as compensation benefits and medical expenses because of the alleged injury, which amount includes a sum of money which was paid by the insurer as a settlement of his claim for additional compensation benefits. The compensation insurer intervened in this suit, demanding that it be reimbursed the amounts paid by it out of the sum which may be recovered from the defendant herein, but that intervention was subsequently dismissed and no such claim is now before us. Defendant contends that it nevertheless is entitled to credit for the compensation benefits which were paid, even though no claim for reimbursement is being made by the compensation insurer.
The applicable rule of law is that in an action in tort by an injured employee against a third party tort feasor, where the liability of the tort feasor is established and the employer does not intervene for reimbursement of compensation benefits paid, the plaintiff is entitled to recover the full amount of the damages sustained by him, without deduction of the amounts which he has received from his employer as compensation benefits. LSA-R.S. 23:1101; Ernst v. New Orleans Public Belt R. R., et al., La.App.Orl., 55 So.2d 657; Edwards, et al. v. Employers Casualty Company, et al., La.App. 2 Cir., 121 So.2d 540; and Hecht v. Toye Bros. Yellow Cab Company, La.App.Orl., 62 So.2d 520. See also Malone, Louisiana Workmen's Compensation, Sec. 365, p. 192 (1964, p. p.). In view of the *893 above cited provision of the Revised Statutes and the established jurisprudence of this state, we conclude that defendant is not entitled to credit for the amounts which Gallagher previously had received as compensation benefits.

Decree
For the reasons herein assigned, the judgment appealed from is amended by reducing the award made to plaintiff, Andrew Richoux, from $5,622.23 to the sum of $4,574.06; and by reducing the award made to plaintiff, Charles Gallagher, from $20,738.25 to the sum of $10,738.25. In all other respects the judgment appealed from is affirmed. The costs of this appeal are assessed to plaintiffs-appeallees.
Amended and affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.
FRUGE, J., recommends rehearing, limited to remand concerning future liability.