Juanita SINKHORN *v.* Joel C. MEREDITH,
Frances L. Meredith and Lillian Denise Meredith,
a Minor, by her next Friend, Joel C. Meredith

5-5568        466 S. W. 2d 927

Opinion delivered May 17, 1971

*Shackleford & Shackleford,* for appellant.

*Richard E. Griffin, Ovid T. Switzer, Bruce D. Switzer* and *Tom Tanner,* for appellees.

CARLETON HARRIS, Chief Justice. The only question on this appeal is whether verdicts awarded Joel C. Meredith, his wife, Frances L. Meredith, and daughter Lillian Denise Meredith, a minor, against Juanita Sinkhorn, appellant herein, were excessive. The three appellees were injured in an accident in Jefferson County on September 1, 1969, and a jury fixed damages at $5,000 for Mr. Meredith, $10,000 for his wife, and $2,500 for the daughter. After motion for a new trial had been overruled, and judgment entered in favor of appellees appellant filed this appeal. Since appellee, Frances L. Meredith, the wife, received the greater injuries, we proceed to first discuss the propriety of the amount of the judgment awarded to her. Following the accident, all three were taken to the Jefferson Hospital in Pine Bluff, where they received treatment from Dr. Nash of that city. Dr. Nash's report related that when Mrs. Meredith was brought to the emergency room, she was somewhat confused, complaining of head, chest, right leg, right and left shoulder injuries; she was admitted to the hospital for further care. His diagnosis related head injuries, left shoulder injuries with pneumothorax, and right leg abrasions. She was discharged to the care of Dr. R. L. Salb, a physician of Crossett. Dr. Salb testified that he was given a history by Dr. Nash, and primarily was to "follow up" on the pneumothorax, the doctor explaining that this was the collapse of a lung.[1] He stated that the clavicle (collarbone) was displaced at the time of the injury and probably punctured the lung and then slipped back out. He observed the fragmented edges of the clavicle, and, from his experience, presumed that was what had happened. The doctor stated that Dr. Nash had already immobilized the clavicle by brace, which was most uncomfortable to the patient. He stated that her injury was a painful one and that she had a painful healing period; that about eight weeks trans-

---

[1]"Well, this is a lung being punctured and air getting in between the lung and the chest wall decreasing the ability of the lung to function. As he said, it was about ten per cent expanded the last time he saw her, well, that would give her probably about a fifty per cent less function of lung on that side because as it decreases toward the cone, of course, the less the vital capacity. So, she would have a fifty per cent vital capacity, probably, with the ten per cent collapse on the left side."

pired before she was free from "quite a bit of discomfort". He said that as she wore the brace, it became loosened in some manner and this slowed the healing. The clavicle had moved out of position, and a malformation in the form of a knot on the clavical would be permanent. Dr. Salb testified that if she were to have lung surgery on the left side, she might have considerable difficulty, "Instead of the lung collapsing when you enter the pleura space, it don't and then you have to start and dissect this lung. From the word go it might be very difficult." He said that the lung was capable of function and would cause no trouble except if she needed lung surgery or another pneumothorax, or treatment for, as an example, tuberculosis; in such case it was possible that there could be grave consequences. The witness stated that this susceptibility would continue for the rest of her life. When asked about a disability evaluation, he answered "It would be somewhere between five and ten per cent, possibly".

Mrs. Meredith, 24 years of age, stated that she received a blow on the side of her head, a fractured collarbone and lung injury, and a cut on her right leg just below the knee. The witness testified to intense ˙pain from the fractured collarbone while in the hospital, and she said the brace, which had to be worn continually, was most uncomfortable and did not help the pain; that the brace irritated a mole on her back, an infection developing. The brace was removed in order for the infection to clear and it was necessary to have the mole removed. Mrs. Meredith wore this brace during September, October, and most of November. She said that after leaving the hospital and going to her mother's home, she was only able to get up to go to the bathroom and to the table to eat. Mrs. Meredith related the difficulties with the fractured clavical, stating:

"The pain was terrible, especially riding from Pine Bluff home. When I got home, the only time I got up was to go to the bathroom and to the table to eat. I had been home about a week I guess and I got up and I went to the table and the thing—the bone moved or something and I just got sick and had to lay back down. Then that

night I was getting up and it moved or done something again and it was just like it broke all over again. I screamed and it just like to have never quit hurting. It was just like it had happened all over again. I couldn't get up or lay down or anything. I could sit down and start to lay down, but then I'd have to have support on my head to get back down. When I would get up, somebody would have to hold me because I would just be so dizzy I couldn't stand up. When I would lay back down, it would feel just like I was falling off the bed."

During this time, Mrs. Meredith also had emotional problems:

"I was nervous anyway, before the wreck. But then when I got there to Mother's, I don't know, I just cried and cried and cried and you could ask me why, I didn't know why I was crying. I was embarrassed to death, because I couldn't do anything for myself. I couldn't even go to the bathroom. I couldn't do anything. I couldn't get in or out of the bathtub myself."

She lost twenty-five pounds after the accident, and when asked her condition at the time of the trial, stated:

"I just don't have any energy. Just doing my normal housework, I'm tired before I get half through. I'm irritable, because I don't feel good."

Of course, during the three months period when she was confined, Mrs. Meredith was unable to look after her child in any way. She testified that her left arm was still weak, and that she had trouble in lifting the baby with that arm.

Mrs. Lilliam Hagood, the mother of Mrs. Meredith, testified that she stayed in the hospital with her daughter for six days, and that on leaving the hospital, the daughter was taken to the mother's home. She said that her daughter was not able to do anything without help, and could not even undress. Mrs. Hagood described the brace as being in the shape of a "figure eight and it was put around her and fastened in the back with some

kind of a buckle". The purpose of the brace was to pull and straighten the shoulder, and it was necessary that Mrs. Meredith wear it at all times. Her left arm was constantly in a sling, and, according to the witness, Mrs. Meredith could do nothing either for herself or the baby. The testimony of Mrs. Meredith and Mrs. Hagood, relative to the injuries and suffering of the wife, was verified by that of Mr. Meredith.

One of the most difficult questions to answer in tort litigation is whether or not a judgment is excessive. This is partly true because there is really no way to measure pain and suffering; actually, some people are more prone to pain than others, and some cannot adjust to it as well as others. We said flatly in *Coca-Cola Bottling Co. of Ark.* v. *Adcox,* 189 Ark. 610, 74 S. W. 2d 771, "There is no rule by which we can measure damages for pain and suffering". Further:

"Plaintiff is not limited in his recovery to specific pecuniary losses as to which there is direct proof, and it is obvious that certain of the results of a personal injury are insusceptible of pecuniary admeasurement, from which it follows that in this class of cases the amount of the award rests largely within the discretion of the jury, the exercise of which must be governed by the circumstances and be based on the evidence adduced, the controlling principle being that of securing to plaintiff a reasonable compensation for the injury which he has sustained. 17 C. J., 869, *et seq.*"

Likewise, in *Turchi* v. *Shepherd,* 230 Ark. 899, 327 S. W. 2d 553 (1959), we said:

"A comparison of awards made in other cases is a most unsatisfactory method of determining a proper award in a particular case, not only because the degree of injury is rarely the same, but also because the dollar no longer has its prior value."

If a dollar no longer had its prior value in 1959, obviously we may use our common knowledge, and courts may take judicial notice of the fact, that the dollar

has considerable less purchasing power today than it did even in 1959. See *Missouri Pacific Railroad Co.* v. *Elvins,* 176 Ark. 737, 4 S. W. 2d 528. When all of the circumstances are considered, we cannot agree that this judgment was excessive.

The amount of $5,000 awarded to Mr. Meredith is also questioned. Mr. Meredith is an employee at the paper mill in Crossett, and is also an ordained minister, having pastored a church in Newport for over a year. Meredith received a bad bruise on his forearm, and was unable for some time to move the hand because of the bruise and swelling. Dr. Nash took x-rays and a splint was placed on it. He was not able to work during the week and sustained lost wages of $96.64. His x-ray services amounted to $36.95; there was also a bill for $46.00 from the Children's Clinic for the care of the daughter. The hospital bill for Mrs. Meredith was $196.75, and laboratory and radiology bills amounted to $121.25. Dr. Nash charged $100.00 for his services to Meredith and his wife and Dr. Salb charged $83.00. The damage to the automobile was covered by insurance except for a $50.00 deductible. Since Mrs. Meredith was unable to care for herself, arrangements were made with her parents for Meredith to pay them the sum of $50.00 per week during the three months period that they lived with her parents; this amount, of course, took care of their meals during this three months period. The testimony revealed rather a close relationship between Meredith and his wife. The two always went together when he would preach a sermon at some church to which he had been invited; she helpfully criticized his sermons and made suggestions for improvement. They read and studied the Bible together, enjoyed going to the park with the baby, and hunted and fished together. Of course, these pleasures had to be held in abeyance during the period of time that Mrs. Meredith was being looked after by her mother. In other words, the normal husband-wife relationship did not exist during that time. In effect, what was said relative to the award given Mrs. Meredith, can also be made applicable to the award given to her husband, and though it was liberal,

we cannot say that it was in such an amount as to demonstrate prejudice and passion on the part of the jury.

We do agree that the award to the child was somewhat excessive, principally because any sort of finding of a serious or lengthy injury would had to have been based on speculation. Dr. Townsend, a Pine Bluff pediatrician, prepared a report which was read into evidence, as follows:

"I saw this seven month old infant for the first time on September 1, 1969. She was involved in an automobile accident and was seen by me in the Jefferson Hospital emergency room. Examination revealed abrasions of her left nostril and face. She was admitted for observation and did quite well. X-rays failed to reveal any fracture. She was discharged on September 4, 1969, to be followed by her physician in Crossett."

It developed that another report had been submitted by Dr. Townsend and it too was read into evidence as follows:

"This seven month old infant was involved in an automobile accident on September 1, 1969. She was seen in the emergency room at which time it was noted that she had an abrasion and contusion to her left face. There was some evidence of bruise on the left foot. Other than this the infant was completely normal. It was felt that due to the fact that the Mother was injured and admitted, it was best to admit the infant for observation. The infant did have a URI on admission and developed a low grade fever. Procaine penicillin was given for this. Skull x-rays and chest x-rays and laboratory work were all within normal limits. It was felt that the only thing that this infant sustained out of the accident was a bruise and abrasion of the left face. She was discharged on September 4, 1969, to be followed at Crossett by her local physician."

The child was never again treated by a physician as a result of the accident, and the testimony offered reflected only that the child cried, mainly because her

mother was unable to pick her up. The grandmother testified "I just can't satisfy her, it took her own mother to do that". Mrs. Hogood stated that the child would awaken in the middle of the night "screaming", which she (Mrs. Hagood) interpreted as caused by fear. Of course, many babies awaken during the night—and the day—crying, and this, in itself, establishes very little. It is quite apparent from the report of Dr. Townsend, and the fact that no further medical services were necessary, that the crying was not caused by physical injury. And the child would certainly seem to be too young (at seven months) for it to be said that emotional, or psychiatric, damage had occurred. At any rate, there was no medical testimony to that effect. We are of the view that $1,500.00 would constitute a generous award.

In accordance with what has been said, the judgments in favor of Frances L. Meredith and Joel C. Meredith are affirmed; the judgment in favor of Lilliam Denise Meredith is affirmed on condition that remittitur is entered as indicated within seventeen calendar days; otherwise, this last judgment will be reversed and the case remanded for a new trial.

FOGLEMAN, J., dissents in part.

JOHN A. FOGLEMAN, Justice, dissenting. I dissent from the remittitur. I can agree that the award is liberal, but I cannot arrive at the conclusion that the lack of medical testimony as to pain and suffering or emotional shock left the jury to speculation only in fixing damages. If this be the case, then most verdicts for this element of damages are based upon speculation, for there are few objective symptoms of this result from an injury and the "pain barrier" of individuals differs as much as any personality trait or element of physical makeup can possibly vary. A seven-month-old baby has only one means of evidencing pain and suffering and emotional upset. That is by crying. She could not communicate internal pain to her physician or to a jury as an adult might. All of us know that many internal injuries are undetected until the injured person can describe pain and its location to a physician. This baby

was entitled to be compensated for the nature, extent and duration of her injury, and any pain, suffering or mental anguish experienced and reasonably certain to be experienced in the future, and not just for visible results of her injury, putting aside the question whether a child should have a cause of action against a third person negligently injuring his parent.[1] A perfectly normal baby, who had previously cried little, would for six or eight weeks awaken screaming, jerking all over and crying hysterically, first in the hospital, later in her grandmother's home and then after she was returned to her own home. Crying spells lasted as long as 30 minutes at a time. She was apparently left with a fear of being alone. On the day of the trial she still required the constant attendance of one or the other of her parents. Her grandmother testified that the baby was sick and that she sometimes called the doctor at night about the child's illness. She admitted that not all of the sickness was directly related to the automobile accident. She told of one occasion in the hospital shortly after the child's injury when the pediatrician gave the baby two shots to quiet her.

I would affirm the judgment in favor of all the appellees.

---

[1]See arguments, pro and con, Annot., 59 A. L. R. 2d 454 (1958). We have held that a minor is entitled to recover compensation for the loss of parental love, care, supervision and training in wrongful death actions. This loss is considered to be a "pecuniary injury" under the wrongful death statute. See *Bridges* v. *Stephens*, 238 Ark. 801, 384 S. W. 2d 490.