**Ethel M. WEST, Plaintiff-Appellee,**

**v.**

**Gary M. JUTRAS, Defendant-Appellant.**

**No. 302, Docket 71–1786.**

United States Court of Appeals, Second Circuit.

Argued Nov. 16, 1971.

Decided Feb. 9, 1972.

John M. Dinse, Burlington, Vt. (Wick, Dinse & Allen, and Michael B. Clapp, Burlington, Vt., on the brief), for defendant-appellant.

James L. Morse, Burlington, Vt. (Wilson, Curtis, Bryan, Quinn & Jenkins, Burlington, Vt., on the brief), for plaintiff-appellee.

Before MOORE, HAYS and MULLIGAN, Circuit Judges.

MOORE, Circuit Judge:

Defendant-appellant, Gary M. Jutras (defendant), appeals from a judgment entered upon a jury verdict against him and in favor of plaintiff, Ethel West (plaintiff or Mrs. West), in the sum of $55,000 for damages for personal injuries sustained by plaintiff for which the jury held defendant liable.

Defendant also appeals from the denial of a motion to set aside the verdict and grant a new trial "on the issue of damages alone."

Because the trial court granted plaintiff's motion for a directed verdict on the issue of liability from which no appeal is taken, the facts will be confined largely to the damages issue.

## I. The Accident

On November 21, 1968, plaintiff, her daughter, her friend Mrs. Clinton, and her two daughters were returning to their homes in Montreal from a shopping trip in Burlington, Vermont. Plaintiff was seated in front on the passenger side, Mrs. Clinton was driving and the girls were in back. At approximately 5:15 P.M., the defendant's car struck Mrs. Clinton's car from the rear. It is not disputed that the cause of this accident was that defendant while traveling at a high rate of speed fell asleep at the wheel.

## II. Plaintiff's Injury

No one was hospitalized as a result of the injury. Mrs. Clinton, in filling out the Vermont State Motor Vehicle Accident Report, left blank the space for indicating personal injuries.

However, Mrs. West suffered considerable pain in her neck. The day following the accident she went to see an internist in Montreal. He recommended that she take Two-Twenty-Twos, codeine pills that can be bought without a prescription, and that she rest in bed. The doctor also specified X-rays. These X-rays showed that Mrs. West suffered no fractures of her bones, and that with the exception of some minimal straightening of the normal cervical-thoradotic spine, they indicated no injury.

The week following the accident, Mrs. West remained in bed. She had difficulty raising her head off the pillow. During the second week she was able to get up out of bed, but stayed at home. Thereafter she was able to resume most of her normal activities, but could not engage in any work requiring strenuous effort. Thus, whereas before the accident Mrs. West was an active housewife, who cut the lawn, gardened, shoveled snow, and even did some house painting, after the accident she could not engage in these activities. She was also forced to curtail her work in preparing refreshments for Red Cross meetings in St. Lambert, and her volunteer kitchen work for a local hospital for mental patients.

Starting in December of 1968 Mrs. West saw an orthopedic surgeon in Montreal, Doctor Murphy. He suggested

heating pads, hot baths, and a Thomas collar [1] to relieve her neck pain. He also recommended that she see a physiotherapist. The physiotherapist suggested exercises that would and did relieve the stiffness in her neck. Mrs. West saw Doctor Murphy four or five times, and the physiotherapist three times. Finally, because of a tingling in her left hand, she saw a neurologist.

Though the condition of her neck had improved since the accident, at the time of trial Mrs. West still could not do heavy housework, occasionally wore the collar, particularly when driving, and once in awhile took a codeine pill to alleviate the pain in her neck. As a result of the visits to doctors and related medical expenses, and cleaning, laundry, and taxi bills occasioned by the injury to her neck, Mrs. West incurred expenses of approximately $1,152.[2]

In the summer of 1970 Mrs. West's husband died. To supplement her income, she decided to return to work. She tried baby sitting but found it too strenuous. In November she took in a boarder, at $25 a month. At the time of trial she intended to return to work as a secretary, her occupation previous to her marriage in 1952.

### III. *Testimony of the Experts at Trial*

In March of 1970 Mrs. West, at her counsel's request, visited an internist from Burlington, Doctor Terrien. He briefly saw her again in November 1970, and on the day before the trial, February 23, 1971. On the basis of the first examination and these two subsequent examinations, Doctor Terrien testified that his conclusion was that Mrs. West "had a cervical neck sprain with irritation of the scalene muscle * * * and also irritation of the sensory nerve supplying the left arm and forearm." [3] While he testified that he believed that the condition of her neck would improve over time, he predicted that she would not be able to perform the tasks of a secretary for two years, and that she would have a permanent disability of the neck of 10–20%. He expressed no opinion as to her ability to perform as a secretary beyond two years from the date of trial. He also predicted that she would develop osteoarthritis [4] as she grew older and that this affliction would aggravate the effects of her injury. As treatment he recommended codeine, heat treatments, and the wearing of the Thomas collar.

Doctor Kuhlmann, an orthopedic surgeon from South Burlington and a part-time Associate Professor of Orthopedic Surgery at the Medical College at the University of Vermont, testified for defendant. He had examined Mrs. West in March of 1970. His conclusion was that there was no permanent impairment to her neck, and that she could return to work as a secretary at the time of trial.

Mr. Hugh Hughes, Vice President and Comptroller of Petrofena Company of Montreal, testified as to Mrs. West's

---

1. "A Thomas collar would be somewhat similar to taking a turkish towel and wrapping it around your neck. It is about the same thickness, but the Thomas collar is much stiffer. As a result of this, it keeps the neck at rest." Testimony of Doctor Terrien, Transcript of Trial at 60.

2. These expenses are broken down approximately as follows: medical and related expenses—$300; house cleaning bills—$694; laundry expenses—$66; taxi fares—$107.

3. Transcript of Trial at 63. Doctor Terrien described the scalene muscle as follows: "A scalene muscle is not a very dramatic muscle in the human, but in the horse, that is how he flicks the flies off his neck." *Id.* at 62.

4. "All of us know as we get older we shrink, and the shrinkage is due to the fact the cushions between our vertebrae begin to deteriorate, and we begin to form bone spurs which is described as osteophytes, and this leads to osteoarthritis of the spine. This is present in 75 per cent of the people over the age of 55 . . . ." *Id.* at 71.

prospects for employment as a secretary. In charge of some 175 office employees, he concluded that Mrs. West would need 5 or 6 months to regain the skills of a secretary; if she took a full-time refresher course then she would need only 2 or 3 months. In his opinion she was presently employable at $77 a week; with the refresher course she could start at $100 a week. He also testified that some secretaries, depending on the nature of their bosses' positions, are paid up to $160 a week. Though he testified that employees with physical disabilities are not employable, he expressed no opinion on whether Mrs. West's injury would disqualify her from working as a secretary.

At the time of trial, Mrs. West's life expectancy was 36 years.

At the close of the evidence, the court granted plaintiff's motion for a directed verdict on the issue of liability. After the jury returned its verdict of $55,000, defendant moved for a new trial. The court denied this motion without opinion on April 15, 1971.

## IV. *Whether the Verdict is Excessive* [5]

■ The standard for review of damage awards to determine whether they are excessive was articulated by this court in *Dagnello* as follows:

> If we reverse, it must be because of an abuse of discretion. If the question of excessiveness is close or in balance, we must affirm. The very nature of the problem counsels restraint. Just as the trial judge is not called upon to say whether the amount is higher than he personally would have awarded, so are we appellate judges not to decide whether we would have set aside the verdict if we were presiding at the trial, but whether the amount is so high that it would be a denial of justice to permit it to stand. We must give the benefit of every doubt to the judgment of the trial judge; but surely there must be an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law.[6]

This test has been implicitly approved by the Supreme Court in *Grunenthal;* [7] that case further directs us to make a detailed appraisal of the evidence bearing on damages in applying the *Dagnello* test. We have made that detailed appraisal as indicated by our statement of the facts, and we conclude that the verdict of $55,000 is excessive.[8]

5. The power to modify and remand for the entry of an appropriate judgment is conferred on this court by 28 U.S.C. § 2106 (1970).

6. Dagnello v. Long Island R. R. Co., 289 F.2d 797, 806 (2d Cir. 1961). The standard applicable to remittitur is governed by federal, not state law. Karlson v. 305 East 43RD Street Corp., 370 F.2d 467, 472 n. 1 (2d Cir.), cert. denied, 387 U.S. 905, 87 S.Ct. 1690, 18 L.Ed.2d 625 (1967). *See* Byrd v. Blue Ridge Rural Electric Cooperative, Inc., 356 U.S. 525, 536–539, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); Brown v. Louisiana & Arkansas Ry. Co., 429 F.2d 1265, 1267 (5th Cir. 1970).

7. Grunenthal v. Long Island R. R. Co., 393 U.S. 156, 159, 89 S.Ct. 331, 21 L.Ed. 2d 309 (1968).

8. State courts frequently exercise the power to modify personal injury awards. *See, e. g.,* Sinkhorn v. Meredith, 466 S.W. 2d 927 (Ark.1971) ($2500 to $1500); Tills v. Elmbrook Memorial Hospital, Inc., 48 Wis.2d 665, 180 N.W.2d 699 (1970) ($35,000 to $25,000 for personal injuries); Engman v. City of Des Moines, 255 Iowa 1039, 125 N.W.2d 235 (1963) ($25,000 to $19,000); Ardoin v. McComb, 251 So.2d 84 (La.Ct.App.3d Cir. 1971) ($4500 to $2000); Riolo v. Liebman Bathroom Specialties, Inc., 31 A.D.2d 633, 295 N.Y.S.2d 962 (2d Dep't 1968), aff'd mem., 25 N.Y.2d 918, 304 N.Y.S.2d 852, 252 N.E.2d 284 (1969) ($62,000 to $45,000); Statella v. Robert Chuckrow Constr. Co., 28 A.D.2d 669, 281 N.Y.S.2d 215 (1st Dep't 1967) ($15,000 to $5,000); Richoux v. Grain Dealers Mut. Ins. Co., 175 So.2d 883 (La.Ct.App.3d Cir.), writ refused, 248 La. 366, 178 So.2d 656 (1965) ($5,622.25 to $4,574.06 with respect to one plaintiff, $20,738.25 to $10,738.25 with respect to the other);

Beyond articulating the standard of review, cases are not greatly helpful in deciding whether particular verdicts are excessive. Instances can be found where verdicts smaller than $55,000 have been reduced,[9] and where verdicts larger than $55,000 have not been reduced.[10] The factors considered by the courts in such reviews appear to be (1) the amount of medical and other expenses occasioned by the injury, (2) the extent of the plaintiff's pain and suffering, (3) the loss of past and future earnings, and (4) the curtailment of the plaintiff's normal activities.

■ First, in this case Mrs. West spent some $1,152 as a result of her neck injury. Second, at trial she testified that she would like to return to secretarial work. If we assume along with Doctor Terrien that she would not be able to work for two years, and if we make the further generous assumption that she could return to work immediately at $100 a week for the first year and $160 a week for the second year, then the loss of her earnings occasioned by the neck injury equals $13,520.[11] Third, while Mrs. West did suffer pain and while some of her daily activities were curtailed, we believe that the approximately $10,000 afforded to her by a $25,000 judgment is ample compensation for such pain, suffering, and inconvenience. Although not controlling, it may be noted that plaintiff herself in the *ad damnum* clause requested $25,000.

## V. The Court's Charge on Earning Capacity

In arguing that the verdict is excessive, defendant further contends that the evidence introduced at trial is insufficient to warrant a charge on impaired earning capacity, and that the charge failed to correctly state the measure of damages for impaired earning capacity.

Because we have decided that the jury verdict of $55,000 is excessive, we would normally not find it necessary to discuss these alternate grounds for reversing the district court's decision to deny defendant's motion for a new trial. However, if plaintiff elects to proceed with a new trial, these same questions could be the basis for a subsequent appeal. To prevent a needless consumption of judicial resources, we will therefore examine the merits of these contentions.

■ First, we do not agree with defendant that there is insufficient evidence to support a charge to the jury on impaired earning capacity. Vermont law is clear that on the question of damages "[i]t is sufficient to go to the jury if the evidence is such as to afford the means of an intelligent estimate of an amount for which recovery may be had."[12] The testimony of Doctor Terrien and Mr. Hughes provided the jury with a sufficient basis upon which to estimate Mrs. West's lost earnings. Doctor Terrien testified that she would not be able to work as a secretary for two

Rizzo v. Long Island R. R. Co., 23 A.D. 2d 762, 258 N.Y.S.2d 576 (2d Dep't 1965) ($10,000 to $3500 for pain and suffering) ; Black v. Port, Inc., 120 Ohio App. 369, 202 N.E.2d 638 (Mahoning Cty. 1963) ($22,000 to $15,000).

9. *See, e. g.*, Caldecott v. Long Island Lighting Co., 417 F.2d 994, 996–997 (2d Cir. 1969) ; Botsford v. Ideal Trucking Co., 417 F.2d 681 (2d Cir. 1969) ; Wicks v. Henken, 378 F.2d 395 (2d Cir. 1967).

10. *See, e. g.*, Benazet v. Atlantic Coast Line R. R. Co., 442 F.2d 694, 697–698 (2d Cir. 1971) ; McNeil v. Lehigh Valley R. R. Co., 387 F.2d 623, 624 (2d Cir. 1967), cert. denied, 390 U.S. 1040, 88

S.Ct. 1638, 20 L.Ed.2d 302 (1968) ; La France v. New York, New Haven and Hartford R. R. Co., 292 F.2d 649, 650 (2d Cir. 1961).

11. This sum is obtained by multiplying 52 by 100 (5200), and adding the resultant product to the product of 52 times 160 (8320).

12. Hall v. Fletcher, 99 Vt. 199, 203, 130 A. 685, 686 (1925) ; Trombetta v. Champlain Valley Fruit Co., 117 Vt. 491, 494, 94 A.2d 797, 799 (1953) ; Brown v. Sutowski, 117 Vt. 377, 380, 91 A.2d 556, 558 (1952). *See* Smith v. State Highway Board, 262 A.2d 486, 488–489 (Vt. 1970).

years, and Mr. Hughes testified as to the possible salaries that she might earn under different assumptions as to her starting skills.

 Second, we agree with defendant that the district court's charge on impaired earning capacity did not correctly state applicable Vermont law.[13] In its charge the court made clear to the jury that it could consider what the plaintiff would earn but for the injury, and that it should discount these amounts to present value. But the court did not instruct the jury that it must subtract from what plaintiff would earn but for the injury what plaintiff would earn even with the injury.[14] While there was evidence that Mrs. West would not be able to work as a secretary for two years, the jury should have been instructed to deduct from its estimate of Mrs. West's "but for" income its estimate of what she will earn during these two years and beyond.

The decision of the district court denying defendant's motion for a new trial on the issue of damages is reversed and a new trial ordered. However, if plaintiff agrees to remit $30,000 of the jury award of $55,000 within 30 days from the date that this opinion is filed, then the district court's decision denying defendant's motion for a new trial is affirmed.

HAYS, Circuit Judge (dissenting):

I dissent from the order of this court granting a new trial on the issue of damages unless appellee agrees to remit $30,000 of the jury's award of $55,000.

The denial by the trial court of a motion for a new trial on the ground of the excessiveness of the jury's award of damages is not to be reversed on appeal unless "the amount [of the jury award] is so high that it would be a denial of justice to permit it to stand." *Dagnello v. Long Island R. R.*, 289 F.2d 797, 806 (2d Cir. 1961). This formulation was approved by the Supreme Court in *Grunenthal v. Long Island R. R.*, 393 U. S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968), in which the Supreme Court reversed a remittitur granted by this court. "[A] detailed appraisal of the evidence bearing on damages," *id.* at 159, 89 S.Ct. at 333, indicates that there is no proper ground for setting aside the jury's verdict.

In deciding "that the approximately $10,000 afforded to [appellee] by a $25,000 judgment is *ample* compensation for such pain, suffering, and inconvenience . . ." (emphasis added), the court has quite unjustifiably substituted its judgment for that of the jury.

The evidence established that, as a result of the accident, appellee experienced difficulty in performing housework or

13. Defendant failed to object to the district court's charge on this ground. Whether such a failure precludes appellate review of the alleged error is a matter of federal, not state law. McNamara v. Dionne, 298 F.2d 352, 355–356 (2d Cir. 1962). See Fed.R.Civ.P. 51. Normally such a failure would preclude review. United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966) (*en banc*). However, we review the merits of the contention in order to eliminate this ground of appeal should there be a new trial and should there be a proper objection.

14. *See* Trombetta v. Champlain Valley Fruit Co., 117 Vt. 491, 494, 94 A.2d 797, 799 (1953) ; Brown v. Sutowski, 117 Vt.

377, 380, 91 A.2d 556, 558 (1952) ; Baldwin v. Gaines, 92 Vt. 61, 72–73, 102 A. 338, 343–344 (1917). *Cf.* Conte v. Flota Mercante Del Estado, 277 F.2d 664, 669 (2d Cir. 1960) :

"The general principle [in determining loss of earning power] is easily stated. The objective is to place the libelant in the same economic position as would have been his if the injury had not occurred. We seek to accomplish this goal by a formula which, stated in oversimplified form, consists of determining what libelant's annual earning power would have been but for the injury, *deducting what it will be thereafter*, multiplying the result by libelant's expectancy, and discounting the product to present value." (Emphasis added.)

other light labor, that she had to forego certain community work in which she had formerly engaged, that from time to time she suffered from pain and that she would continue to have such pain. These items cannot be precisely measured. There is no justification for this court's setting aside the award of the jury because the court believes that a smaller sum would be "ample." The award does not constitute a denial of justice nor does it shock the conscience. Larger awards for pain and suffering have recently been upheld by this court in similar cases. See Friedman v. N. B. C. Motorcycle Imports, Inc., 452 F.2d 1215 (2d Cir. 1971); Benazet v. Atlantic Coast Line R. R., 442 F.2d 694 (2d Cir. 1971); Fuchstadt v. United States, 442 F.2d 400 (2d Cir. 1971).

I would sustain the district court's refusal to grant a new trial.